UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LEONARD RANDOLPH,

                    Plaintiff,

          v.                                    **DECISION AND ORDER**
                                                12-CV-745S

THOMAS R. GRIFFIN, THOMAS E. HANNAH,
MICHAEL V. ROBYCK, JAMIE M. ROBINSON,
DONALD C. McINTOSH, WILLIAM F. SKELLY,
JEREMY M. CLEMENT, and JAMES GILBERT,

                    Defendants.

## I. INTRODUCTION

In this action, Plaintiff Leonard Randolph alleges that various defendants, all of whom are employees of the New York Department of Corrections and Community Supervision ("DOCCS"), violated his constitutional rights by using excessive force against him, failing to intervene and protect him against the use of excessive force, denying him adequate medical care, and prohibiting him from freely exercising his religion. He brings these five First and Eighth Amendment claims under 42 U.S.C. § 1983.

Presently before this Court is Defendants' motion for summary judgment, which Randolph opposes. (Docket No. 97.) The motion is fully briefed and oral argument is unnecessary. (Docket Nos. 97, 105, 108, 121-3, 124, 125.) For the following reasons, Defendants' motion is granted in its entirety.

## II. BACKGROUND

### A. Facts

At all times relevant, Randolph was an inmate at the Southport Correctional Facility

1

under the care and custody of DOCCS, having arrived there on December 20, 2011.[1]

(Defendants' Statement of Undisputed Facts ("Defendants' Statement"), Docket No. 97-2, ¶ 33; Deposition of Leonard Randolph ("Randolph Dep."), Docket No. 105-2, p. 14.[2])

Defendant Thomas R. Griffin was the superintendent of Southport. (Declaration of Thomas Griffin ("Griffin Decl."), Docket No. 97-5, ¶ 2.) Defendant Jeremy M. Clement was a registered nurse at Southport. (Defendants' Statement, ¶ 82.) Defendants Thomas E. Hannah, Michael V. Robyck, Jamie M. Robinson, Donald C. McIntosh, William F. Skelly, and James Gilbert were all corrections officers at Southport. (Declaration of Thomas E. Hannah ("Hannah Decl."), Docket No. 97-7, ¶¶ 1, 2; Defendants' Statement, ¶ 25; Declaration of William F. Skelly ("Skelly Decl."), Docket No. 97-9, ¶¶ 1, 2; Declaration of Donald C. McIntosh ("McIntosh Decl."), Docket No. 97-8, ¶¶ 1, 2.)

### 1. Yarmulke Incident

Randolph has been a practicing member of the Jewish faith since 2008. (Randolph Dep., p. 22.) On December 28, 2011, Randolph left his cell on A-block to participate in recreation. (Id. pp. 16, 21.) He was wearing both his yarmulke and a winter hat. (Id. p. 21.) On the way to the recreation yard, Defendant Gilbert stopped Randolph and told him that he could not wear both his yarmulke and his winter hat. (Id.) Randolph relayed his understanding that he could wear both at the same time and asked Gilbert what directive he was violating. (Id.) Gilbert told Randolph that he would check the directive and then allowed him to proceed to recreation wearing both his yarmulke

---

1 Randolph has since been transferred to the Sing Sing Correctional Facility. (Docket No. 130.)

2 Deposition citations are to the page numbers generated by the CM/ECF system.

and winter hat.   (Id.)

When Randolph returned from recreation, Defendant Gilbert told him that he could wear either his yarmulke or winter hat, but not both.   (Id.)   Randolph again voiced his disagreement and reiterated his understanding that he could wear both together.   (Id. p. 22.)   Randolph continued to challenge Gilbert after he was locked back into his cell, and he requested the names of the other officers who were present.   (Id.)   According to Randolph, Gilbert became upset and told him that he would flush both his yarmulke and his winter hat down the toilet if he continued to ask questions about the policy or the other officers.   (Id.)   Randolph reported this threat to Deputy Superintendent of Security Sheehan,[3] who said that he would look into it.   (Id. pp. 23, 24.)

Later that day, Randolph was directed to "pack up."   (Id. p. 20.)   Before he did so, Gilbert returned to Randolph's cell and asked for his yarmulke.   (Id. p. 23.)   Randolph's yarmulke was state-issued and had been given to him by the rabbi.   (Id. p. 24.)   Randolph gave Gilbert his yarmulke as directed and never saw it again.   (Id. pp. 23, 24.)   Randolph did not receive another yarmulke until "several months thereafter," when an "associate" of the Jewish faith gave him one.[4]   (Id. p. 22.)

At his deposition, Randolph acknowledged that he had received and reviewed the Southport manual upon his arrival at Southport.   (Id.)   He further acknowledged that he was familiar with the provision that "[n]o extra and/or double clothing items will be worn" during recreation, which Defendant Griffin explained is a security measure employed to

---

[3] Sheehan is not a defendant in this action.

[4] It is noted, however, that Randolph subsequently testified that he was wearing a yarmulke just 20 days later during the use-of-force incident that underlies his excessive force claim.   (Randolph Dep., pp. 38-40.)

reduce an inmate's ability to transport contraband.   (Id. p. 26; Southport Manual Excerpt, Docket No. 97-3, p. 64; Griffin Decl., ¶ 8.)   Randolph testified, however, that in his view, wearing a yarmulke was not "double clothing" because a yarmulke is a religious head-covering, not an article of clothing.   (Randolph Dep., pp. 26-27.)

Before this incident, Randolph never had a problem with Defendant Gilbert; Gilbert had never written him up or threatened him.   (Id. p. 22.)   Although Randolph sent a letter to Deputy Superintendent Sheehan complaining about this incident, he did not file a grievance.   (Id. pp. 28-30.)

For his part, Defendant Gilbert has no recollection of this event and could not confirm or deny whether it ever occurred.   (Deposition of James Gilbert ("Gilbert Dep."), Docket No. 105-2, pp. 253-254, 271.)

### 2.  Use-of-Force Incident

It is undisputed that a use-of-force incident occurred on January 17, 2012, but the parties' versions of that incident differ.

#### a.  Plaintiff's Version

Randolph maintains that Defendants Robyck, Robinson, McIntosh, Skelly, and Gilbert assaulted him on January 17, 2012, while taking him to recreation. (Randolph Dep., pp. 30-31, 70.)   Defendants Robyck, Robinson, and Gilbert arrived at Randolph's cell on A-block and directed him to place his hands through the feeder port to be handcuffed.   (Id. p. 31.)   They then directed him to face away from the cell door as they entered.   (Id.)   Randolph complied with these directives and stood handcuffed and

facing away as the cell door opened.[5]   (Id.)

Immediately upon the cell door opening, Defendant Robyck grabbed Randolph, pushed him halfway into the cell, and punched him in the jaw.   (Id. pp. 31-32, 108.) Robinson then entered and Randolph was thrown onto the bed.   (Id. p. 32.)   Someone kicked Randolph—perhaps Robinson—and Defendant Gilbert was now in the cell holding Randolph's leg.   (Id. pp. 32, 111-112.)   Randolph tried to get under the bed to escape the defendants, who were punching him on both sides of his face with what he believed were closed fists.   (Id. pp. 32, 34, 44-45.)   One of the officers hit Randolph on the left side of his face with a baton.   (Id. pp. 32, 33.)   Randolph was also hit in the right lower back with a baton, and Defendant Gilbert was "rolling" a baton over the inside of his ankle.[6]   (Id. pp. 34-36.)

As Randolph was struggling to work himself under the bed, he heard Defendant Gilbert call him a "fucking scumbag" and direct the other defendants to turn him over. (Id. pp. 32, 36, 70.)   Randolph continued to struggle as the defendants flipped him over and continued punching him.   (Id. p. 33.)   After several more punches and kicks, some from Defendants McIntosh and Skelly who had arrived on the scene, Randolph heard Defendant Hannah say "that's enough."   (Id. pp. 33, 37, 70-73, 112-113.)   The defendants then rolled Randolph over and put him in leg irons.   (Id. p. 33.)

---

[5] Randolph testified that because he was preparing to go outside for recreation, he was wearing a state-issued winter coat and boots and was carrying a hat.   (Randolph Dep., p. 36.)   He was also wearing a yarmulke and his glasses.   (Id. pp. 38-40.)

[6] Randolph described the "rolling" of his ankle with the baton as something taught at "the academy." (Randolph Dep., pp. 34-35.)   Though he had some difficulty describing what he thought was done to his ankle, Randolph suggests that he may have experienced a law enforcement technique designed to incapacitate, as he further testified that he had difficulty walking on his ankle afterward.   (Id. p. 35.)

Once Randolph was secured in the leg irons, the defendants took him to the showers, where they again punched him several times. (Id. pp. 33, 41-42.) Randolph saw Defendant Hannah hit him but is unsure which of the other defendants also hit him. (Id. pp. 42-43.) During this encounter, Defendant Griffin walked by on a tour of A-block, and Randolph called out to him. (Id. pp. 45, 115-117.) Griffin stopped to briefly consult with Hannah, but then left the area without acknowledging Randolph. (Id. pp. 45-46, 112.)

After Defendant Griffin left A-block, Randolph was moved to a different part of the block to be medically evaluated. (Id. pp. 46-47.) Randolph's outer clothing was removed so that Defendant Clement could examine him and photographs could be taken of his injuries. (Id. pp. 46-47, 51.) Randolph told Clement that the left side of his face hurt and was swollen. (Id. p. 47.) He also told Clement that his leg, back, and ankles were "bothering" him. (Id. p. 48.) Randolph asked to see a doctor or be given medication for the swelling, but neither request was granted. (Id.) Other than initially examining Randolph, Clement provided no treatment or medication at the scene. (Id. p. 48, 49.)

Randolph testified that he did not receive medical treatment for his injuries until the day after the incident, when he put in for a sick call. (Id. p. 48.) At that time, his face, back, and ankle were swollen, and his ankle had dark red bruises on it. (Id. pp. 35, 48.) The day after that—January 19, 2012—Randolph was examined again, and then eventually given Flexeril for pain on January 24, 2012. (Id. pp. 49, 55.)

Randolph testified that he had never had a problem with Defendants Robyck or

Robinson, and other than the December 28, 2011 incident involving his yarmulke, had never had a problem with Defendant Gilbert.  (Id. pp. 37-38.)

### b.  Defendants' Version

Defendants Robyck and Robinson went to Randolph's cell on January 17, 2012, to take him for recreation.   (Deposition of Michael Robyck ("Robyck Dep."), Docket No. 105-2, p. 307; Deposition of Jamie Robinson ("Robinson Dep."), pp. 351-352.)   Robyck applied Randolph's handcuffs and Robinson applied a waist restraint.   (Robyck Dep., pp. 307-308; Robinson Dep., p. 352.)   Robyck had no difficulty applying the handcuffs, but after Randolph's cell door was opened and the two officers entered for Robinson to apply the waist restraint, Randolph moved aggressively toward Robinson and tried to hit him in the left side of his face with his cuffed hands.   (Robyck Dep., p. 308; Robinson Dep., pp. 352-353.)

In response, Defendants Robyck and Robinson used force to subdue Randolph. (Robyck Dep., p. 309; Robinson Dep., p. 354.)   Robinson put Randolph in a bear hug, wrapping his arms around Randolph between his elbows and shoulders.   (Robinson Dep., p. 354.)   Randolph struggled with Robinson and continued to move his cuffed hands upward.   (Id. p. 354.)    Robinson directed Randolph not to resist, but Randolph continued to struggle to break free of the bear hug.   (Id. pp. 354, 360-361.)

With Randolph still struggling, Robyck grabbed Randolph's coat and helped Robinson take Randolph to the ground, where the two officers held Randolph until he became compliant.   (Robyck Dep., pp. 310, 313-314, 316-317; Robinson Dep., pp. 354, 357.)   Robinson testified that Randolph's face could possibly have hit the floor; Robyck

could not recall whether it did or not. (Robinson Dep., p. 356; Robyck Dep., p. 314.) Neither Robinson nor Robyck made any contact with Randolph's head. (Robinson Dep., p. 363.) Although unsure, Robyck estimated that this incident lasted between one and four minutes. (Robyck Dep., p. 319.) Robinson testified that the incident was "not very long." (Robinson Dep., p. 359.)

Defendant Robyck does not recall punching, kicking, or striking Randolph with a baton, or whether Defendant Robinson punched or kicked Randolph. (Robyck Dep., pp. 314, 316-317.) Robinson denies punching or kicking Randolph, and never saw Robyck or any other officers punch or kick Randolph. (Robinson Dep., pp. 358, 368.) Defendants Robyck and Gilbert never had a prior altercation with Randolph and did not recall having any subsequent problems with him. (Robyck Dep., pp. 305, 321; Gilbert Dep., p. 265.) Robinson does not recall ever meeting Randolph before this incident. (Robinson Dep., p. 347.)

Other officers responded to the scene after being summoned by intercom, including Defendants Hannah, Gilbert,[7] Skelly, and McIntosh, each of whom arrived after Randolph became compliant. (Robyck Dep., pp. 318-319; Robinson Dep., p. 359; Gilbert Dep., pp. 255, 258-259; Hannah Decl., ¶¶ 6, 9; Skelly Decl., ¶ 7; McIntosh Decl., ¶ 7.) Hannah directed Officer Brimmer to put Randolph in leg restraints as Defendants Robyck and Robinson continued to subdue him. (Hannah Decl., ¶ 6.) Brimmer and

---

7 Defendant Gilbert did not recall any incident involving Randolph. (Gilbert Dep., pp. 262, 265-266, 271.) Like Defendants Robyck and Robinson, Gilbert testified that he never punched or kicked Randolph, was not involved in the physical altercation, and never saw any other officer punch or kick him. (Gilbert Dep., pp. 264-265, 270.) He further testified that he did not carry a baton at the time in question. (Gilbert Dep., p. 265.)

Officer Sullivan then brought Randolph to his feet and took him to the showers for a medical evaluation and to be photographed.[8]  (Robyck Dep., p. 40; Robinson Dep., pp. 359, 361; Hannah Decl., ¶ 7.)

Defendant McIntosh filmed Randolph being escorted to the shower area, and Defendant Skelly took the use-of-force photographs.  (Hanna Decl., ¶ 7; Skelly Decl., ¶ 5; McIntosh Dep., ¶ 5.)  Hannah, Skelly, and McIntosh each deny ever striking or using physical force against Randolph.  (Hanna Decl., ¶ 11; Skelly Decl., ¶ 8; McIntosh Decl., ¶ 8.)

Defendant Griffin recalls that during his tour of A-block that day, he was alerted to a security incident, which prompted his group to leave the block.  (Griffin Decl., ¶ 5.) Griffin did not hear Randolph call out to him and only learned about the incident after he later reviewed use-of-force reports prepared by the corrections officers.  (Id. ¶¶ 6, 7.)

Defendant Clement performed Randolph's medical evaluation.  (Deposition of Jeremy Clement ("Clement Dep."), Docket 97-3, p. 142.)  He observed injuries to Randolph's face.  (Id. pp. 142-143.)  Clement noted in his use-of-force report that Randolph had "slight swelling to left cheek," and that he "complained of pain to right cheek with no evidence of injury."  (Use-of-Force Report, Docket No. 97-3, p. 152.)  He further explained that he "noted left cheek slight swelling, tenderness at site, no bruising or open skin area."  (Id. p. 153.)  As to the right side, Clement noted "[right] cheek complained of tenderness, no noted swelling/bruising @ site."  (Id. p. 153.)  Clement's examination of Randolph's mouth revealed that his tongue and teeth were intact, his gum-line was

---

8 Brimmer and Sullivan are no longer defendants in this case.  (See Docket Nos. 53, 63.)

undamaged, and he was not bleeding or swollen. (Id. p. 153.) Clement noted that Randolph reported no other injuries and he found no others during his examination. (Id. pp. 153, 155.)

Randolph's medical records show that in the days following this incident, he had slight swelling in his ankle on January 18, 2012, complained of pain in his ankle and hip on January 19, 2012, and had slight swelling in his lower back on January 20, 2012. (Declaration of Wesley Canfield ("Canfield Decl."), Docket No. 97-4, ¶¶ 5-7.) He was prescribed Tylenol on January 18, 2012, and Flexeril (a muscle relaxant and pain reliever) on January 20, 2012. (Id. ¶¶ 5, 7.)

### B. Procedural History

Randolph commenced this action pro se on August 7, 2012, by filing a complaint in the United States District Court for the Western District of New York. (Docket No. 1.) Because the court granted Randolph *in forma pauperis* status, it screened his complaint as required under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a) and directed service. (Docket No. 4.) Before service, however, Randolph filed an amended complaint on August 28, 2012 (Docket No. 5), which the court also screened and directed service (Docket No. 7).

On December 11, 2012, Defendants filed a Motion to Dismiss Randolph's amended complaint for failure to state a claim upon which relief could be granted and for lack of subject-matter jurisdiction. (Docket No. 26.) Randolph subsequently filed several motions to amend his complaint (Docket Nos. 28, 37, 40) but did not file his proposed amended complaint until after Defendants had already responded to his last

motion to amend (see Docket Nos. 46, 51).   Thereafter, Randolph filed a Motion to Release Parties (Docket No. 53), in which he voluntarily dismissed former defendants Charles M. Sullivan and Joshua G. Brimmer from this action, and a Motion to Clarify certain of Defendants' opposition papers (Docket No. 48).   On January 30, 2014, Randolph filed a Motion for Preliminary Injunction and Temporary Restraining Order. (Docket No. 55.)

On July 17, 2014, this Court filed a Decision and Order granting Randolph leave to file his second amended complaint, granting his request to dismiss former defendants Sullivan and Brimmer, denying his motion to clarify, denying his motion for injunctive relief, and granting Defendants' motion to dismiss in part and denying it in part.   (Docket No. 63.)   Randolph's second amended complaint was filed that same day.   (Docket No. 64.)

After Defendants filed their answer on August 1, 2014 (Docket No. 65), this Court referred this matter to the magistrate judge for completion of pretrial proceedings. (Docket No. 66.)   The magistrate judge granted Randolph's motion for appointment of counsel on October 20, 2014, when counsel entered this case.[9]   (Docket No. 74.)

Upon completion of discovery, Defendants filed the instant motion for summary judgment on December 2, 2015.   (Docket No. 97.)   Final briefing, including the filing of supplemental memoranda, concluded on November 1, 2016.   (Docket Nos. 124, 125.)

### III. DISCUSSION

Five claims remain.   First, Randolph alleges that Defendants Robyck, Robinson,

---

9 This Court extends its gratitude to counsel for accepting assignment of this case.

Gilbert, McIntosh, and Skelly violated his Eighth Amendment rights by using excessive force against him on January 17, 2012. Second, Randolph alleges that Defendant Hannah violated his Eighth Amendment rights by failing to intervene to stop the alleged use of excessive force. Third, Randolph alleges that Defendant Griffin violated his Eighth Amendment rights by failing to protect him from the alleged use of excessive force. Fourth, Randolph alleges that Defendant Clement violated his Eighth Amendment rights by failing to treat the injuries he suffered as a result of the alleged use of excessive force. Finally, Randolph alleges that Defendants Gilbert and Griffin violated his First Amendment right to freely exercise his religion by confiscating his yarmulke on December 28, 2011.

### A. General Legal Principles

#### 1. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import

of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

## 2. Section 1983 and Personal Involvement

Randolph brings each of his claims under 42 U.S.C. § 1983. Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.

<u>See</u> 42 U.S.C. § 1983.   To succeed on a § 1983 claim, a plaintiff must establish that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."   <u>Whalen v. County of Fulton</u>, 126 F.3d 400, 405 (2d Cir. 1997); <u>see also</u> <u>Hubbard v. J.C. Penney Dep't Store</u>, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983.   <u>See</u> <u>Haygood v. City of New York</u>, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999).   It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.   <u>See</u> <u>McKinnon v. Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1977); <u>Richardson v. Coughlin</u>, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); <u>Pritchett v. Artuz</u>, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."   <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996); <u>see also</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).   Personal involvement need not be active participation.   It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act."   <u>See</u> <u>Meriwether v. Coughlin</u>, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged
> constitutional violation;   (2) the defendant, after being
> informed of the violation through a report or appeal, failed to
> remedy the wrong; (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom; (4) the
> defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or (5) the defendant
> exhibited deliberate indifference to others' rights by failing to
> act on information indicating that constitutional acts were
> occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58

F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d

Cir. 2003).

### 3.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat.

1321 (1996), which imposes several restrictions on the ability of prisoners to maintain

federal civil rights actions, expressly requires that "[n]o action shall be brought with

respect to prison conditions under section 1983 of this title, or any other Federal law, by

a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted."   42 U.S.C. § 1997e(a); see also Woodford v.

Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d (2006) ("Exhaustion is . . .

mandatory.   Prisoners must now exhaust all 'available' remedies[.]"); Hargrove v. Riley,

No. 04–CV–4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion

requirement is a mandatory condition precedent to any suit challenging prison conditions,

including suits brought under Section 1983.").   "[T]he PLRA's exhaustion requirement

applies to all inmate suits about prison life, whether they involve general circumstances

or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).

In the event the defendant establishes that the inmate plaintiff failed to fully complete the administrative review process before commencing the action, the plaintiff's complaint is subject to dismissal. See Pettus v. McCoy, No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006); see also Woodford, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95; accord Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007).

In New York, formal exhaustion of administrative remedies for prison inmates requires compliance with a detailed three-step grievance and appeal procedure. See Morrison v. Parmele, 892 F. Supp. 2d 485, 487 (W.D.N.Y. 2012) (citing 7 N.Y.C.R.R. § 701.5)). The grievance process outlined at § 701.5 provides that: (1) the inmate must submit a written complaint to the Grievance Clerk within 21 calendar days of the alleged occurrence; the Grievance Clerk then submits the complaint to the Inmate Grievance Resolution Committee ("IGRC") for investigation and review; (2) if the IGRC denies the grievance, the inmate may appeal to the superintendent of the facility by filing an appeal with the IGP clerk; (3) after the superintendent issues a decision, the inmate may appeal to the Central Office Review Committee ("CORC"), which makes the final administrative determination. See Thousand v. Corrigan, 9:15-CV-01025 (MAD/ATB), 2017 WL 1093275, at *3 (N.D.N.Y. Mar. 23, 2017); Turner v. Goord, 376 F. Supp. 2d 321, 323

(W.D.N.Y. 2005). "A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." Hairston v. LaMarche, Case No.05 Civ. 6642, 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases). If all three levels of review are exhausted, the prisoner may seek relief in federal court under § 1983. See Thousand, 2017 WL 1093275, at *3; Bridgeforth v. DSP Bartlett, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010).

While the Supreme Court has deemed the exhaustion of administrative remedies generally mandatory, it has held that a prisoner's duty to exhaust is limited to "available" administrative remedies.[10] Ross v. Blake, __ U.S. __, 136 S. Ct. 1850, 1855, 195 L. Ed. 2d 117 (2016) ("A prisoner need not exhaust remedies if they are not 'available.'"). "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." Id. at 1858. To be "available," administrative remedies (e.g., grievance procedures) must be "capable of use to obtain some relief for the action complained of." Id. at 1859 (quoting Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)). The Court in Ross identified three circumstances in which an administrative remedy may be unavailable:

> First, an administrative remedy may be unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In other words, some mechanism exists to provide

---

[10] With this holding, the Court in Ross rejected the Second Circuit's "extra-textual" exception to the exhaustion requirement, which allowed courts to consider whether "special circumstances" justified a prisoner's failure to exhaust administrative remedies. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016) (recognizing that Ross largely abrogates the framework set forth in Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004) and Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), which set forth a "special circumstances" exception to the PLRA's exhaustion requirement).

relief, but no ordinary prisoner can discern or navigate it. Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

Williams v. Priatno, 829 F.3d 118, 123-24 (2d Cir. 2016) (citing Ross, 136 S. Ct. at 1859-60) (quotation marks and citations omitted).

As it relates to Randolph's Eighth Amendment claims, both sides have presented evidence and arguments supporting their positions regarding exhaustion. From this Court's review, there may indeed exist disputed issues of material fact concerning whether Randolph exhausted all available remedies, particularly as it relates to his contention that he submitted grievance documents that were discarded by prison officials, rather than properly processed. This, however, does not preclude summary judgment because in the end, there is insufficient evidence from which a reasonable fact-finder could conclude that Randolph's Eighth Amendment rights were violated. This Court will therefore assume proper exhaustion and move directly to the merits of Randolph's Eighth Amendment claims in the interests of judicial economy. See Blythe v. Delaware Cty. Bd. of Prison Inspectors, No. 16-4673, 2018 WL 1620980, at *3 (E.D.Pa. April 4, 2018) (assuming without deciding at summary judgment stage that the plaintiff exhausted all available remedies); Anderson v. United States, No. 11-1486 (DWF/LIB), 2013 WL 1173948, at *7 n. 12 (D.Minn. Jan. 25, 2013) (same); Floyd v. Hergenrother, No. 1:11-CV-158-RJC, 2012 WL 2091175, at *5 (W.D.N.C. June 11, 2012) (same); Long v. Bryant, No. 9:07-CV-3881-GRA, 2008 WL 3010089, at *8 (D.S.C. July 31, 2008) (assuming proper exhaustion and moving to merits of claims where affidavits concerning exhaustion

were in contradiction).

As it relates to Randolph's First Amendment claim, however, he concedes that he did not file a grievance concerning his interaction with Defendant Gilbert that culminated in the confiscation of his yarmulke. (Randolph Dep., pp. 28-30.) When directly asked whether he filed a grievance related to this incident, Randolph responded, "No. I just wrote to the Dep. of Security." (Randolph Dep., p. 30.) Letters of complaint, however, do not satisfy the exhaustion requirement. See Macias, 495 F.3d at 44 (informal complaints do not constitute exhaustion); Scott v. Gardner, 287 F. Supp. 2d 477, 488 (S.D.N.Y. 2003) (letters of complaint are not part of the grievance process and do not satisfy the exhaustion requirement). This claim must therefore be dismissed for failure to exhaust administrative remedies.[11]

### 4. Statute of Limitations

The statute of limitations for a § 1983 claim is "that which the State provides for personal-injury torts." Wallace v. Kato, 549 U.S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007). In New York, that statute of limitations is three years. See Berman v. Perez, No. 17-CV-2757 (JGK), 2018 WL 565269, at *2 (S.D.N.Y. Jan. 24, 2018) (citing Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013), in turn citing N.Y. C.P.L.R. § 214).

Randolph filed his complaint on August 7, 2012. (Docket No. 1.) Consequently, any claims pre-dating August 7, 2009, which there are none, would be time-barred.

---

11 Despite conceding at his deposition that he failed to file a grievance concerning the confiscation of his yarmulke, Randolph argues that a grievance he filed two years after the incident entitled "Wear Two Hats" constitutes proper exhaustion. (Grievance List, Docket No. 121-3, p. 3.) Not only is there no indication whatsoever that this grievance had anything to do with the December 28, 2011 incident involving Defendant Gilbert, this grievance was filed on January 16, 2013, almost five months *after* Randolph filed this action. Consequently, there could be no finding that the filing of this grievance, even if relevant, constitutes proper exhaustion *before* filing suit, as is required.

## B. Randolph's Eighth Amendment Claims

### 1. Excessive Force, Failure to Intervene, Failure to Protect

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 11 S. Ct. 2321, 2323, 115 L. Ed. 2d 271 (1991); U.S. Const. amend. VIII. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." Helling v. McKinney, 509 U.S. 25, 32, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (quotation and citation omitted). Part of the state's duty is to protect inmates from punishments that are "totally without penological justification." See Williams v. Fitzpatrick, No. 03 CV 11, 2006 WL 1889964, at *2 (D.Vt. July 10, 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).

To succeed on an Eighth Amendment excessive force claim, a plaintiff must establish (1) objectively, that the defendant's actions violated contemporary standards of decency, and (2) subjectively, that the defendant acted wantonly and in bad faith. See Flynn v. Ward, 9:15-CV-1028, 2016 WL 1357737, at *8 (N.D.N.Y. Apr. 5, 2016) (quoting Blyden v. Mancusi, 186 F.3d 252, 262-63 (2d Cir. 1999)).

### a. The Objective Requirement

To meet the objective requirement, the alleged violation must be sufficiently serious by objective standards, those being contemporary standards of decency. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Blyden, 186 F.3d at 263. Although the "*de minimis* use of force will rarely suffice to state a

constitutional claim," <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993), "the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance 'contemporary standards of decency are always violated,'" <u>Flynn</u>, 2016 WL 1357737, at *8 (quoting <u>Blyden</u>, 186 F.3d at 263).   Thus, *de minimis* use of force is excluded from constitutional recognition "provided that the use of force is not of a sort repugnant to the conscience of mankind."   <u>Green v. Morse</u>, No. 00-CV-6533, 2005 WL 1490301, at *2 (W.D.N.Y. June 23, 2005) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)).

The Second Circuit has explained an excessive force claim as follows:

> The malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident.   This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.   Nevertheless, a *de minimis* use of force will rarely suffice to state a constitutional claim.   Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

<u>Griffin v. Crippen</u>, 193 F.3d 89, 91 (2d Cir. 1999) (citations and internal quotations omitted).

Thus, the objective prong may be satisfied without a showing of a serious or significant injury, as long as the amount of force used is not *de minimis*.   <u>See</u> <u>United States v. Walsh</u>, 194 F.3d 37, 50 (2d Cir. 1999).   At bottom, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   <u>Hudson</u>, 503 U.S. at 7 (citation omitted); <u>see also</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (per curiam)

(describing this inquiry as "the core judicial inquiry").  In other words, the key consideration is the nature of the force rather than the extent of the injury.  See Wilkins, 559 U.S. at 34.

### b.  The Subjective Requirement

To meet the subjective requirement, "the inmate must show that the prison officials involved 'had a wanton state of mind when they engaged in the misconduct.'"  See Griffin, 193 F.3d at 91 (quoting Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994)).  In this context, the test for wantonness "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003).  Factors to be considered are "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."  Id. (citation omitted).

### c.  Analysis

Randolph maintains that Defendants Robyck, Robinson, Gilbert, McIntosh, and Skelly used excessive force against him on January 17, 2012.  But having viewed the evidence and drawn all inferences in Randolph's favor, this Court finds that no reasonable fact-finder viewing the admissible evidence could find that these defendants violated Randolph's right to be free from excessive force.

First, despite identifying witnesses to the incident (see, e.g., Randolph Dep., pp.

22

73-75, 106-110), Randolph has presented no evidence to corroborate his version of the January 17, 2012 incident.   His testimony is simply a restatement of the allegations contained in his second amended complaint.   According to Randolph, five corrections officers delivered multiple closed-fisted punches to his face, body blows, kicks, baton strikes to his face and back, and a debilitating baton "rolling" technique to his ankle while he was handcuffed and defenseless.   Yet this attack left him with only slight swelling and possibly some bruising.   This defies both logic and common sense.   Given the absence of evidence corroborating Randolph's bare allegations, Defendants are entitled to summary judgment.   See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (conclusory allegations and unsubstantiated speculation cannot defeat summary judgment); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994) ("mere allegations or denials" not enough to defeat summary judgment); Adilovic v. County of Westchester, No. 08-CV-10971, 2011 WL 2893101, at *7 (S.D.N.Y. July 14, 2011) (uncorroborated claims of a forceful beating alone cannot defeat summary judgment); Yearwood v. LoPiccolo, No. 95 CIV. 2544 (DC), 1998 WL 474073, at *3 (S.D.N.Y. Aug. 10, 1998) (finding that a plaintiff cannot rely on bald assertions but must instead provide some basis to believe that his version of events is not fanciful).

Second, the record evidence belies both Randolph's account of the incident and the notion that he sustained a sufficiently serious use of force.   The contemporaneous medical examination, records, and photographs reveal only slight swelling to the left side of Randolph's face, no injury to the right side, and no bruising or cuts.   And despite claims

of absorbing multiple blows to his face and jaw, including a direct strike from a baton, Randolph sustained no dental injuries and no swelling or bleeding in his mouth. Even in the days following the incident, Randolph experienced only slight swelling and some mild pain that was resolved with Tylenol and Flexeril. Non-serious injuries of this ilk indicate a *de minimis* use of force. See Berkley v. Ware, No. 9:16-CV-1326 (LEK/CFH), 2018 WL 3736791, at *8 (N.D.N.Y. July 6, 2018) (swelling insufficiently serious); Gallagher v. Derkovicz, 13-CV-804 (LJV)(MJR), 2017 WL 1435710, at *1 (W.D.N.Y. Apr. 24, 2017) (temporary redness on the side of the face and slight pain *de minimis*); Evans v. Balmer, No. 13-CV-805 (MAT), 2017 WL 1106939 (W.D.N.Y. Mar. 24, 2017) (swelling of eye *de minimis*); White v. Williams, No. 12-CV-1775, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) (finding *de minimis* injuries and granting summary judgment where plaintiff's claims belied by medical records); Bermudez v. Waugh, No. 09:11-CV-947 (MAD/DEP), 2013 WL 654401, at *5 (N.D.N.Y. Feb. 21, 2013 (tackling of inmate that caused minor bruising was *de minimis*); James v. Phillips, No. 05 Civ. 1539 (PKC)(KNF), 2008 WL 1700125, at *4 (S.D.N.Y. Apr. 9, 2008) (swelling of chin insufficiently serious); Bove v. New York City, 98 Civ. 8800, 1999 WL 595620, at *6 (S.D.N.Y. Aug. 6, 1999) (bruising *de minimis*).

Third, without reconciling the parties' competing versions of the incident, this Court notes that the record evidence of Randolph's injuries is more consistent with Defendants' version, which involves a body lock and take down employed to subdue an aggressive inmate, during which Randolph's head may have hit the ground, resulting in some

swelling. Such a use of force is not "of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10. Consequently, a reasonable fact-finder could not find in Randolph's favor on the objective prong of the analysis. See Alvarenga v. Vanderwyde, No. CV-02-4932 (FB), 2004 WL 1092306, at *3 (E.D.N.Y. May 12, 2004) ("While the parties dispute the underlying facts of the altercation, [plaintiff] cannot establish that the force used against him was anything other than *de minimis*, and therefore defendants are entitled to summary judgment."); Gashi v. County of Westchester, No. 02 CV 6934 GBD, 2007 WL 749684, at *6 (S.D.N.Y. Mar. 12, 2007) (granting summary judgment where plaintiff's claims of a brutal and savage assault were at odds with the objective evidence of record).

Fourth, given the lack of evidence corroborating Randolph's version of the incident, there is insufficient evidence from which a reasonable fact-finder could conclude that the named defendants acted maliciously. Randolph conceded that he never had problems with Defendants Robyck or Robinson, and other than the December 28, 2011 yarmulke incident, never had a problem with Defendant Gilbert. These three defendants similarly testified that they never had a negative interaction with Randolph. And the objective medical evidence reveals that no matter what occurred during the incident, Randolph sustained only slight swelling and possibly some bruising, all of which is consistent with the *de minimis* application of force to subdue an unruly inmate. There is simply no evidence from which a reasonable fact-finder could conclude that the named defendants applied force maliciously and sadistically to cause Randolph harm, rather than in a good-

25

faith effort to maintain order.  See Scott, 344 F.3d at 291.  A reasonable fact-finder therefore could not find in Randolph's favor on the subjective prong of the analysis.  Cf. Griffin, 193 F.3d at 91 (malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident); Green, 2005 WL 1490301, at *3 ("even if the harm inflicted is not significant, if plaintiff can show malicious intent then the objective prong will [ ] almost always be satisfied").

Finally, to the extent Randolph would premise his claim on the basis that Defendant Gilbert called him a "fucking scumbag," it is well settled that verbal harassment and name-calling are not constitutional violations cognizable under § 1983.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) (finding that a claim that a prison guard called an inmate a name does not allege any appreciable injury); see also Murray v. Kirkpatric, 06-CV-598SR, 2007 WL 541986, at *4 (W.D.N.Y. Feb. 13, 2007); Rivera v. Goord, 119 F.Supp.2d 327, 342 (S.D.N.Y. 2000) (collecting cases).  Name-calling, without more, simply does not violate the constitution.  See Cuoco v. U.S. Bureau of Prisons, No. 98 Civ. 9009, 2001 WL 167694, at *3 (S.D.N.Y. Feb. 16, 2001) (finding that although abhorrent, verbal harassment and profanity do not violate an inmate's constitutional rights); see also Brown v. Croce, 967 F. Supp. 101, 104 (S.D.N.Y. 1997) (racial slurs and epithets not actionable); Jeromosen v. Coughlin, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) (same).

For all of these reasons, Defendants are entitled to summary judgment on Randolph's Eighth Amendment excessive force claim.  And because Randolph's failure-

to-intervene claim against Defendant Hannah and failure-to-protect claim against Defendant Griffin are premised on his failed excessive force claim, Defendants are entitled to summary judgment on those claims as well. See Jacobs v. Bayha, 616 Fed.Appx. 507, 515 n.13 (3d Cir. July 14, 2015) ("in the absence of excessive force, there was no failure to protect"); Alexander v. Nolan, 6:17-CV-725 (GTS/ATB), 2018 WL 6621400, at *8 (N.D.N.Y. Dec. 18, 2018) (finding that failure-to-intervene claim requires underlying constitutional violation) (collecting cases); Walker v. City of New York, 11-CV-314 (CBA)(JMA), 2014 WL 12652345, at *12 (E.D.N.Y. Sept. 3, 2014) ("To prevail on a failure to intervene claim a plaintiff must demonstrate the existence of an underlying constitutional violation in which the defendant officer failed to intervene.") (collecting cases); Jenkins v. Caplan, No. C 02-5603 RMW (PR), 2012 WL 12904629, at *15 (N.D.Ca. Mar. 30, 2012) ("Because the court finds that Thompson did not use excessive force, plaintiff's "failure to protect" claim against Padilla necessarily fails."); Lopez v. City of New York, No. 05 Civ. 10321 (NRB), 2009 WL 229956, at *6 (S.D.N.Y. Jan. 30, 1999) (finding that absence of excessive force precludes a finding of failing to intervene).

### 2. Denial of Medical Treatment

Prison conditions and the treatment prisoners receive while incarcerated— including medical treatment— are subject to scrutiny under the Eighth Amendment. See DeShaney v. Winnebago County Dep't of Social Svcs., 489 U.S. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). The United States Supreme Court has specifically recognized that a prisoner's claim that he was denied medical treatment is cognizable

under the Eighth Amendment through § 1983:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

Estelle v. Gamble, 429 U.S. 97, 104, 106, 97 S. Ct. 285, 50 L. Ed. 2d 25 (1976) (quotations and citations omitted).

But "not every lapse in prison medical care will rise to the level of a constitutional violation." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). Rather, an Eighth Amendment violation occurs only when two requirements—one objective, one subjective—are met.

### a. The Objective Requirement

The first requirement is that the deprivation of medical care be objectively "sufficiently serious." Wilson, 501 U.S. at 298. That determination in turn requires a two-fold inquiry: first, whether the prisoner was actually deprived of adequate medical care, and if so, whether the inadequacy in medical care was sufficiently serious. See Salahuddin, 467 F.3d at 279-280.

On the first question, the Supreme Court has determined that prison officials' duty is limited to providing only reasonable care. See Farmer, 511 U.S. at 844-47.

28

Consequently, "prison officials who act reasonably in response to an inmate-health risk cannot be found liable and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." Salahuddin, 467 F.3d at 279-280 (quotations and citations omitted).

On the second question, "the court [must] examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280.

If the claim is that prison officials failed to provide any treatment at all for an inmate's medical condition, courts examine whether the inmate's untreated medical condition is sufficiently serious. Id. (citing Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003)). In this regard, more than minor discomfort or injury is required to demonstrate a serious medical condition implicating the Eighth Amendment. See Evering v. Rielly, No. 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001). Factors relevant to the inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citations omitted)). In the end, the medical condition must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); see also Chance, 143 F.3d at 702; Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998).

If the claim is that prison officials provided medical care that was inadequate, "the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Id. (quoting Smith, 316 F.3d at 185.)

### b. The Subjective Requirement

The second requirement is that the prison official must act with a sufficiently culpable state of mind. A plaintiff must prove that the defendant acted with deliberate indifference. See Wilson, 501 U.S. at 302. That is, the defendant must have acted or failed to act "while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280. As the Second Circuit has explained: "[t]he reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." Id. (citing Farmer, 511 U.S. at 835, 842). But the risk of harm must be substantial and the official's actions more than merely negligent. Id. Medical malpractice and negligence, for example, are not actionable under § 1983. See Salahuddin, 467 F.3d at 280. Nor is the denial of a preferred course of treatment or disagreement over proper treatment. See, e.g., Chance, 143 F.3d at 703 ("it is well-established that mere disagreement over the proper treatment does not create a constitutional claim . . . [s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); Dean v. Coughlin, 804

F.2d 207, 215 (2d Cir. 1986) (noting that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated").

Importantly, "the charged official must be subjectively aware that his conduct creates [a risk of harm]." Salahuddin, 467 F.3d at 281 (citing Farmer, 511 U.S. at 837). A "defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere . . . Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 281.

### c. Analysis

Randolph claims that Defendant Clement denied him medical treatment at the scene. He maintains that he told Clement that the left side of his face hurt and was swollen, and that his leg, back, and ankles were "bothering" him. Clement examined Randolph and determined that no treatment or medication was necessary to address Randolph's slight swelling in his left cheek, which was the only visible injury. It is undisputed that beyond performing a medical evaluation, Clement provided no treatment and prescribed no medication.

Having viewed the evidence and drawn all inferences in Randolph's favor, this Court finds that no reasonable fact-finder viewing the admissible evidence could find that Defendant Clement unconstitutionally denied him adequate medical care.

First, as noted above, Randolph has failed to present competent evidence demonstrating that he suffered a sufficiently serious injury during the use-of-force incident. More than minor discomfort or injury is required to demonstrate a serious medical condition implicating the Eighth Amendment. See Evering, 2001 WL 1150318,

31

*9. At the time Defendant Clement examined him, Randolph had, at worst, some swelling in his face, some bruising, and conditions that "bothered" him in his leg, back, and ankles. And as stated, the medical records and use-of-force photographs reveal only slight swelling on the left side of Randolph's face.

As indicated, the Second Circuit has set forth a number of factors to be considered when determining whether a serious medical condition exists. See Chance, 143 F.3d at 702. These factors include, but are not limited to, "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." Chance, 143 F.3d at 702 (quoting McGuckin, 974 F.2d at 1059-60 (citations omitted)).

There are numerous examples of injuries that courts have found to be too lacking in seriousness to raise Eighth Amendment concerns. See, e.g., Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303 (S.D.N.Y. 2001) (cut finger); Henderson v. Doe, No. 98 CIV. 5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (broken finger); Rivera v. Johnson, No. 95 CIV. 0845E(H), 1996 WL 549336 at *2 (W.D.N.Y. Sept. 20, 1996) (broken finger); Tyler v. Rapone, 603 F. Supp. 268 (E.D.Pa. 1984) (toothache and cut); Glasper v. Wilson, 559 F. Supp. 13 (W.D.N.Y. 1982) (lack of immediate medical attention for bowel problems).

There are also numerous examples of injuries found to be sufficiently serious to satisfy the Eighth Amendment standard. See Neitzke v. Williams, 490 U.S. 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) (brain tumor); Hathaway, 37 F.3d at 66 (two year delay

in arranging hip surgery); <u>Williams v. Vincent</u>, 508 F.2d 541, 544 (2d Cir. 1974) (loss of an ear); <u>Corby v. Convoy</u>, 457 F.2d 251 (2d Cir. 1972) (serious nasal problem); <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (abortion); <u>Griffin v. DeRobertis</u>, 557 F. Supp 302, 306 (N.D.Ill. 1983) (spitting up blood).

The swelling and discomfort Randolph suffered undoubtedly falls into the former category of injuries that are not sufficiently serious to raise Eighth Amendment concerns. <u>See, e.g.</u>, <u>Telesford v. Wenderlich</u>, 16-CV-6130 CJS, 2018 WL 4853667, at *11 (W.D.N.Y. Oct. 5, 2018) (finding minor injuries, including facial swelling, insufficiently serious to support an Eighth Amendment medical claim); <u>Strange v. Westchester Cty. Dep't of Corr.</u>, 17-CV-9968 (NSR), 2018 WL 3910829, at *4 (S.D.N.Y. Aug. 14, 2018) (soft tissue injuries not sufficiently serious); <u>Crawford v. Wenger</u>, 6:13-CV-6638 (MAT), 2018 WL 3093333, at *6 (W.D.N.Y. June 22, 2018) (swollen eye not sufficiently serious); <u>Dallio v. Hebert</u>, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (two black eyes (among other injuries) not sufficiently serious).   There is simply no evidence in the record from which a reasonable fact-finder could conclude that Randolph suffered from an untreated medical condition that was "sufficiently serious, in the sense that [it was] a condition of urgency, one that may produce death, degeneration, or extreme pain."   <u>Hemmings v. Gorczyk</u>, 134 F.3d 104, 108 (2d Cir. 1998).

Second, even assuming that Randolph could establish that he suffered a sufficiently serious injury such that he is able to meet the objective component, this Court finds that he cannot meet the subjective component, because there is no evidence that Defendant Clement acted wantonly.   Clement examined Randolph and assessed his

injuries. While Randolph disagrees with Clement's conclusion that his injuries did not require treatment or medication, Randolph is not entitled to dictate his own course of treatment. See Chance, 143 F.3d at 703 ("it is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). And even if the medical assessment Clement provided fell below the applicable standard of care, "[a] showing of medical malpractice is . . . insufficient to support an Eighth Amendment claim." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003). Put simply, no reasonable fact-finder could conclude that Clement acted with a sufficiently culpable state of mind to meet the deliberate indifference standard. See Hathaway, 37 F.3d at 66.

For these reasons, Defendant Clement is entitled to summary judgment on Randolph's Eighth Amendment denial-of-medical-treatment claim.


## IV. CONCLUSION

For the reasons stated above, Randolph's First Amendment free-exercise claim must be dismissed for failure to exhaust administrative remedies and Defendants are entitled to summary judgment on his Eighth Amendment claims. Defendants' motion will therefore be granted.


## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment

(Docket No. 97) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.


Dated:   January 22, 2019
             Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
